716 F.2d 130
 1984 A.M.C. 1, 1984-1985 O.S.H.D. ( 27,250
 Craig McCARTHY, Plaintiff-Appellant,
v.
THE BARK PEKING, her sails, equipment, appurtenances, etc.,
and South Street Seaport Museum, Third Party
Plaintiff-Appellee,
The State Insurance Fund and Northbrook Excess and Surplus
Insurance, Third Party Defendants-Appellees.
 No. 1411, Docket 81-7587.
 United States Court of Appeals,
Second Circuit.
 Submitted April 21, 1983.
Decided Aug. 23, 1983.
 
 Richard L. Dahlen, Edwin F. Lambert, Jr., and Dahlen & Gatewood, Boston, Mass., together with Zock, Petrie Reid & Curtin, New York City, submitted a brief for plaintiff-appellant McCarthy.
 Francis X. Byrn, William J. Troy III, and Haight, Gardner, Poor & Havens, New York City, submitted a brief for third party plaintiff-appellee South Street Seaport Museum.
 Alan G. Choate, Joseph F. Moore, Jr., Wayne W. Suojanen, and Pepper, Hamilton & Scheetz, Philadelphia, Pa., together with Mark O. Kasanin, Richard C. Brautigam, and McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., submitted a brief amici curiae for Nat. Maritime Historical Soc. and Nat. Maritime Museum Ass'n.
 Before TIMBERS, KEARSE and CARDAMONE, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Following our prior decision in this case on April 12, 1982, 676 F.2d 42 (2 Cir.1982), appellant petitioned for certiorari with respect to a part of our decision. On January 24, 1983, the Supreme Court entered the following order (459 U.S. --- (1983)):
 
 
 2
 "82-53 McCarthy v. Bark Peking. The petition for a writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of Director, Office of Workers' Compensation Programs, United States Department of Labor v. Perini North River Associates, 459 U.S. --- (1983)."
 
 
 3
 On March 3, 1983, upon receipt of a certified copy of the judgment of the Supreme Court, an order was entered by our Court vacating our judgment of April 12, 1982. On March 31, 1983, we entered a further order inviting counsel to file supplemental briefs addressed to the issue with respect to which the case had been remanded to us for further consideration. Such briefs have been filed. The case is now ripe for decision by us on the remand from the Supreme Court.
 
 
 4
 For the reasons stated below, we affirm our prior decision in part, and vacate and remand in part.
 
 I.
 
 5
 We assume familiarity with the facts of this case as summarized in our prior opinion, 676 F.2d at 44-45, as well as in the excellent opinion of the district court of June 3, 1981.
 
 
 6
 In short, McCarthy was injured on December 12, 1979 while painting the upper mainmast and spars of the Bark Peking, a museum vessel on exhibit as one of the artifacts at the South Street Seaport Museum. Her rudder is welded in one position and she has not put to sea under her own power for half a century. McCarthy commenced an action in the Southern District of New York on June 9, 1980, seeking, in Count I, damages against the vessel itself and against its owner, the Museum, under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Secs. 901-950 (1976 & Supp. V 1981) (LHWCA or Act). In Count II, he sought damages against the Museum because of an allegedly wrongful discharge pursuant to Sec. 11(c)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. Sec. 660(c)(1) (1976) (OSHA).
 
 
 7
 In affirming the district court's order granting summary judgment in favor of defendants, we held, with respect to Count I, that McCarthy was not engaged in "maritime employment" at the time of his injury; that he therefore was not an "employee" within the meaning of Sec. 2(3) of the Act, 33 U.S.C. Sec. 902(3) (1976); and that, since he was not an "employee" for purposes of the LHWCA, he could not recover damages under its provisions. 676 F.2d at 45-46.
 
 
 8
 With respect to Count II, we affirmed the district court's order granting summary judgment in favor of the Museum on the ground that McCarthy had failed to file a timely complaint with the Secretary of Labor, as required by Sec. 11(c)(2) of OSHA, and therefore had not exhausted his administrative remedies. 676 F.2d at 46-47. Judge Kearse, concurring in the judgment that McCarthy could not recover under Count II, placed her concurrence on the ground that there is no implied right of action under Sec. 11(c), as the Sixth Circuit had held in Taylor v. Brighton Corp., 616 F.2d 156 (6 Cir.1980).
 
 II.
 
 9
 As for Count II outlined above, McCarthy did not include our decision with respect thereto in his petition for certiorari. Our holding on that count, set forth in Part IV of our opinion of April 12, 1982, stands undisturbed. We therefore confirm that part of our prior opinion and the judgment entered thereon.
 
 III.
 
 10
 We turn next to Count I, as to which the Supreme Court remanded the case to us for reconsideration.
 
 
 11
 (A)
 
 
 12
 In Director, Office of Workers' Compensation Programs, United States Dept. of Labor v. Perini North River Associates, 459 U.S. --- (1983), the Court held that a construction worker injured on a cargo barge--where he was working to build a foundation for a sewage treatment plant--was engaged in "maritime employment". With respect to the status requirement of Sec. 902(3), the Court held that "[w]e consider those employees to be 'engaged in maritime employment' not simply because they are injured in a historically maritime locale, but because they are required to perform their employment duties upon navigable waters." 459 U.S. at ---.
 
 
 13
 Having reconsidered our prior decision in the light of Director, as the Court has ordered us to do, we now hold that McCarthy was a covered employee for purposes of the LHWCA, and that the Bark Peking is a "vessel" to the extent that McCarthy properly may allege the "negligence of a vessel" and thus bring his action for damages under 33 U.S.C. Sec. 905(b) (1976).
 
 
 14
 We conclude that McCarthy now must be considered to have been engaged in "maritime employment" at the time he was injured on the Bark Peking on December 12, 1979. He was "injured on the actual navigable waters in the course of his employment on those waters...." Director, 459 U.S. at ---. Under this latest Supreme Court decision, no more is required to qualify McCarthy as a statutory "employee".
 
 
 15
 (B)
 
 
 16
 That, however, does not end our inquiry under Count I.
 
 
 17
 Since we hold that McCarthy was a statutory employee and thus was covered under the Act, we must now consider a second issue which we did not have the occasion to reach in our prior decision, namely, whether McCarthy was injured as the result of "the negligence of a vessel" within the meaning of Sec. 905(b), so that his statutory remedies are not limited by Sec. 905(a), the exclusivity provision of the Act.[1]
 
 
 18
 The Museum and intervenors National Maritime Historical Society and National Maritime Museum Association now ground their argument entirely on the claim that the Bark Peking, museum piece that she is, does not qualify as a "vessel" for purposes of Sec. 905(b), and therefore McCarthy could not have been injured as the result of "the negligence of a vessel". We hold that this is an unsupported narrowing of the term "vessel" as it is used in the Act.
 
 
 19
 The 1972 amendments to the Act, note 1 supra, which provided that a statutory employee may bring an action for damages against a vessel for injuries caused by "the negligence of a vessel", Sec. 905(b), added to the statute in Sec. 902(21) only a circular definition of the term "vessel":
 
 
 20
 "The term vessel means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."
 
 
 21
 Obviously this definition does not provide precise guidance as to what is included within the term "vessel". The legislative history similarly is not helpful. Those courts which have considered the term subsequent to the 1972 amendments, however, have held it to be broadly inclusive.
 
 
 22
 For example, in Burks v. American River Transportation Co., 679 F.2d 69 (5 Cir.1982), the court held that non-propelled river barges, in use as transports, were "vessels" within the meaning of Sec. 905(b). Such varying seafaring entities as a 97% completed destroyer, Lundy v. Litton Systems, Inc., 624 F.2d 590 (5 Cir.1980), cert. denied, 450 U.S. 913 (1981), a yard derrick barge, Richardson v. Norfolk Shipbuilding & Drydock Corp., 479 F.Supp. 259 (E.D.Va.1979), aff'd on other grounds, 621 F.2d 633 (4 Cir.1980), and a floating crane, Bongiovanni v. N.V. Stoomvaart-Matts "Oostzee", 458 F.Supp. 602 (S.D.N.Y.1978), also have been held to be "vessels" within the meaning of Sec. 905(b).
 
 
 23
 We do not believe that our canvass should be confined to those cases decided subsequent to the 1972 amendments. Courts which have construed the term "vessel", under the LHWCA as well as in analogous contexts, almost uniformly have adopted the definition set forth in the General Provisions of the United States Code, 1 U.S.C. Sec. 3 (1976) ("section 3"), referred to below. E.g., Norton v. Warner Co., 321 U.S. 565, 571 n. 4 (1943) (LHWCA); Burks v. American River Transportation Co., supra, 679 F.2d at 75 (LHWCA); Bongiovanni v. N.V. Stoomvaart-Matts "Oostzee", supra, 458 F.Supp. at 609 (LHWCA). Since Congress, in its use of the term "vessel" in Secs. 902(21) and 905(b), did not provide a definition different from the generally acknowledged one found in section 3, we may presume, as other courts have, that it intended to adopt this commonly-used term. Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947, 952-53 (7 Cir.), aff'd, 442 U.S. 940 (1979).[2]
 
 
 24
 Section 3 defines "vessel" to include "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. Sec. 3 (1976) (emphasis added). Pursuant to the axiom that "vessels" must be at least capable of use as a means of transportation on water, courts uncertain of a particular craft's place in nautical taxonomy have drawn distinctions based on the presence or absence of this residual capacity. Compare, e.g., Keller v. Dravo, 441 F.2d 1239, 1243-44 (5 Cir.), cert. denied, 404 U.S. 1017 (1971) (floating drydock attached to dock and used as construction platform held not to be a vessel under LHWCA as a matter of law); Chahoc v. Hunt Shipyard, 431 F.2d 576, 577 (5 Cir.1970) (same), with Burks v. American River Transportation Co., supra, 679 F.2d at 71, 75 (non-propelled river barge held to be a vessel).
 
 
 25
 At the same time, however, virtually any capacity for use as seagoing transportation--perhaps even the hypothetically plausible possibility has sufficed to lend the dignity of "vessel" status to a host of seemingly unlikely craft. E.g., Hudson Harbor 79th Street Boat Basin, Inc. v. Sea Casa, 469 F.Supp. 987, 989 (S.D.N.Y.1979) (houseboat capable of being towed from one location to another viewed as analogous to a "dumb barge" and held therefore to be a section 3 vessel for purposes of admiralty and maritime jurisdiction); Miami River Boat Yard, Inc. v. 60' Houseboat, 390 F.2d 596, 597 (5 Cir.1968) (powerless houseboat held to be a "vessel"); M/V Marifax v. McCrory, 391 F.2d 909, 910 (5 Cir.1968) (decommissioned Navy ship, 15 years in mothballs, held to be a "vessel" while in preparation for return to service as civilian ship); Luna v. Star of India, 356 F.Supp. 59, 63-66 (S.D.Cal.1973) (historic ship in use as part of a maritime museum held to be a "vessel" because she was "capable of engaging in maritime transportation, if only as a towed craft"); The Showboat, 47 F.2d 286, 287 (D.Mass.1930) (retired schooner converted into a restaurant and dance hall remained a "vessel" under section 3).
 
 
 26
 In a variety of contexts, adding for illustrative purposes some of the cases we have already discussed, courts have found the following to be "vessels": Salgado v. M.J. Rudolph Corp., 514 F.2d 750, 755-56 (2 Cir.1975) (floating crane); Bongiovanni v. N.V. Stoomvaart-Matts "Oostzee", supra, 458 F.Supp. at 610 (same); In Re Queen Ltd., 361 F.Supp. 1009, 1010-11 (E.D.Pa.1973) (propellerless boat awaiting transfer to a permanent berth); Lundy v. Litton Systems, Inc., supra, 624 F.2d at 592 (uncompleted destroyer);[3] Jones v. One Fifty Foot Gulfstar, 625 F.2d 44, 47 n. 2 (5 Cir.1980) (ocean-tested yacht still in construction on dry land). Even more surprising, a Navy vessel converted into a stationary shrimp-processing plant was held to be a section 3 vessel in Pleason v. Gulfport Shipbuilding Corp., 221 F.2d 621, 623 (5 Cir.1955).[4] As Judge John Brown of the Fifth Circuit stated the section 3 "vessel" anachronism: "[n]o doubt the three men in a tub would also fit within our definition [of "vessel" under Sec. 3], and one could probably make a convincing case for Jonah inside the whale." Burks v. American River Transportation Co., supra, 679 F.2d at 75.[5]
 
 
 27
 In light of the non-nautical concept of a vessel which has emerged in the case law, we are constrained to hold that the Peking remains a vessel despite her age and current use. No rational person would suggest that the Peking is in a position gracefully to "slip her moorings, ease into the harbor and head for the open seas...." McCarthy v. The Bark Peking, supra, 676 F.2d at 44. On the other hand, the district court found that the Peking was capable of being towed, welded rudder notwithstanding.[6] Less than ten years ago, following her purchase by her present owner, the Peking underwent a stormy voyage--albeit in tow--across the Atlantic to her berth at the South Street Seaport Museum. The Museum concededly is engaged in the restoration of the ship to at least a semblance of her once-proud bearing--if only, as it states, for illustrative purposes.
 
 
 28
 This brings the Peking into the category of many other vessels with similarly limited capacities. A craft need not be actually engaged in navigation or commerce in order to come within the definition of "vessel". The question is one of residual capacity. Farrell Ocean Services, Inc. v. United States, 631 F.2d 91, 93 (1 Cir.1982); M/V Marifax v. McCrory, supra, 391 F.2d at 910. In Marifax the vessel had been in mothballs for 15 years. In Luna v. Star of India, supra, 356 F.Supp. at 63-66, the vessel was an historic three masted bark on display, like the Peking, as a museum ship. The court, interpreting section 3, held that as a museum ship she remained a vessel despite her long absence from the sea and her artifact status. See also The Showboat, supra, 47 F.2d at 286-87.
 
 
 29
 The houseboat in Hudson Harbor 79th Street Boat Basin v. Sea Casa, supra, 469 F.Supp. at 989, was no more likely to slip her moorings and head for the open seas than is the Peking. But the court in that case found, for the purpose of establishing its admiralty and maritime jurisdiction, that "it is clear that a floating houseboat capable of being towed from one location to another is a vessel within the admiralty and maritime jurisdiction of this Court."
 
 
 30
 The Museum and the intervenors, asserting that the Peking cannot be considered a vessel, rest their argument on the legislative history of Sec. 905(b) which was added by the 1972 amendments. They claim that this section was intended to limit actions for damages. To the extent that this argument relies on the provision of Sec. 905(b) which eliminates both the employee's action for unseaworthiness and the shipowner's action for indemnity from a negligent employer, the argument is correct. Section 905(b) was intended to "reduce litigation, immunize stevedores and their insurers from liability in third party actions, and assure conservation of stevedore resources for compensation awards to longshoremen." Bloomer v. Liberty Mutual Insurance Co., 445 U.S. 74, 84 (1981). But this section of the statute and the accompanying legislative history evince no intention to limit the scope of the employee's negligence remedy against the vessel by placing a restrictive construction on the term "vessel". See generally H.R.Rep. No. 92-1441, 92nd Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Ad.News 4698.
 
 
 31
 The Peking may be fated to ride at anchor for the rest of her days. Her rudder is welded in place. Her owner has no intention of slipping her moorings and taking her again to the open seas, with the seagulls in her wake. But she retains at least this much of the dignity of her former venerable station: as long as she rides at anchor in the harbor, ready and able to head for the open seas, even in tow, she remains a vessel. Much as we should like to formulate a definition of "vessel" that captures the essence of the seagoing definiendum, no Platonic form suggests itself; hence we are left with the halting efforts of the common law. The Peking, despite her moorings and her role as a museum piece, still rests upon navigable waters and may be returned to the sea, if only in tow. Paraphrasing the late Mr. Justice Frankfurter in a different context, we "cannot keep the word of promise to [her] ear ... and break it to [her] hope."[7]
 
 
 32
 In light of the expansive scope that has been given to the section 3 definition of "vessel", we hold that the Peking is a vessel for purposes of the LHWCA, and that McCarthy may bring his action under Sec. 905(b) to recover damages for the "negligence of a vessel".
 
 
 33
 Affirmed in part, and vacated and remanded in part for further proceedings in the district court consistent with this opinion. No costs in this Court on the instant remand.
 
 
 
 [1]
 Under the Act, an injured employee is entitled to prescribed compensation from his employer. Secs. 907-909. He may not bring an action against his employer for damages beyond the compensation remedy. Sec. 905(a). An injured employee, however, may bring an action for damages against the vessel and her owner if his injury was caused by "the negligence of a vessel". Sec. 905(b). If the owner also is the employer, the action for damages will still lie notwithstanding the purported exclusivity of the compensation remedy. Reed v. S.S. Yaka, 373 U.S. 410 (1963)
 This current state of the law is the result of the 1972 amendments to the LHWCA, Pub.L. No. 92-576, codified at 33 U.S.C. Secs. 901-950 (1976), they having replaced the employee's action for unseaworthiness--which in effect was a nautical rule of strict liability, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95 (1946)--with an action against the vessel for negligence. At the same time, Congress eliminated the owner's indemnity action against the longshore employer. Sec. 905(b). The net result of the amendments was to limit the remedies of a statutory employee to two: compensation from the employer regardless of fault, and an action for damages against the vessel where the employee's injury was caused by "the negligence of a vessel".
 
 
 [2]
 In contrast, cases decided under the Jones Act, 46 U.S.C. Secs. 541-713 (1976), have looked to a different test in determining what is a vessel for Jones Act purposes. E.g., Blanchard v. Engine & Gas Compressor Services, 575 F.2d 1140, 1142 (5 Cir.1978); Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817, 823 (5 Cir.1975), cert. denied, 423 U.S. 1050 (1976)
 
 
 [3]
 But see Garcia v. American Marine Corp., 432 F.2d 6, 7 (5 Cir.1970) (substantially uncompleted ship held not to be a vessel); Jefferson v. SS Bonny Tide, 281 F.Supp. 884 (E.D.La.1968) (same)
 
 
 [4]
 The court in Pleason, 221 F.2d at 623, gave a graphic description of the condition of the vessel:
 "A prior owner ... had decided to scrap her, and had sold a substantial amount of her tackle and apparel. At the time she was brought in for the above-mentioned repairs, she was in substantially the following condition: her propellers and propeller shafts had been removed; she had no crew; none of her machinery was in operation; she had no light, heat, or power in operation; her main engines had been completely removed; all of her steering apparatus, with the exception of the rudder, had been removed and sold; her superstructure and masts were intact; her navigation lights were in place, though not operable; her compartmentation, including cargo holds, was intact....
 After the services ... were performed, she was towed across the Gulf of Mexico from Port Arthur to Port Isabel without crew or motive power or operative steering device of any kind. 'At Port Isabel she was moored to a dock by steel cables and ropes and engaged in receiving shrimp from trawlers for processing, freezing, storing and resale in commerce, in the same manner as a similar plant would operate on land. Shrimp were delivered on board in baskets just as they are unloaded on a dock or wharf. Telephone and electric lines from land were connected ... although she had her own power system. The location of the vessel was changed once when she was towed down the ship channel and again secured, in the same manner, in a stationary position.' "
 
 
 [5]
 Indeed, a recent generation of law clerks, in their nefarious account of a voyage on a 22 foot sloop off the rock-bound coast of Maine, undoubtedly would be surprised to learn that they had been on a section 3 vessel and that they were covered by the LHWCA. Wald and Ford, "The Death Voyage Of The Ensign " (1980) (unpublished)
 
 
 [6]
 The district court described the Peking as follows--a description which we adopted in our prior opinion (676 F.2d at 44):
 "The [B]ark PEKING, launched in 1911 at Hamburg, Germany, is a four-masted steel-hulled 377-foot vessel weighing 2,883 net tons. Between 1974 and 1976 it was purchased for its present owners, defendant South Street Seaport Museum; towed across the Atlantic to New York; berthed for repairs on Staten Island; and, ultimately, towed to South Street Seaport. It there serves as a museum and is occasionally rented out to private parties as an entertainment hall. Although it remains capable of being towed, its rudder has been welded in one position and it has not put out to sea since the 1930's. It is not subject to inspection by the United States Coast Guard and has not been so inspected. Its present owners affirm that they do not intend ever to return it to active navigation, and nothing in the record before us suggests a contrary intent."
 
 
 [7]
 Griffin v. Illinois, 351 U.S. 12, 24 (1956) (Frankfurter, J., concurring)