561 So.2d 38 (1990)
Chester J. ORGERON, Jr. and his wife, Connie E. Lynn Camus Orgeron
v.
AVONDALE SHIPYARDS, INC.[*]
No. 89-C-1455.
Supreme Court of Louisiana.
February 5, 1990.
Rehearing Denied March 8, 1990.
*39 Owen J. Bradley, Michael R. Guidry, Law Offices of Owen J. Bradley, Frederick W. Swaim, Loyola Law School, New Orleans, for applicant.
Patrick H. Patrick, Edward J. Koehl, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for respondent.
WATSON, Justice.
In this claim for damages under the Longshore and Harbor Workers' Compensation Act (LHWCA), the threshold issue is whether the work barges on which plaintiff was injured qualify as vessels under the Act.[1]

FACTS
On September 9, 1983, plaintiff, Chester J. Orgeron, Jr., was employed in ship repair at Avondale's Quick Repair Yard which is located on a slip fronting the Harvey Canal. The slip is dredged to a depth of twenty-five to twenty-seven feet. Both the slip and the canal are part of the Intracoastal Waterway, a navigable artery of commerce. Working at night, Orgeron fell into an opening between two barges or pontoons. He alleged negligence of Avondale or its vessels.
*40 The pontoons were floating work platforms which also moved men and materials over the water comprising the slip of the Harvey Quick Repair Yard. Lance S. Bourgeois, Jr., the yard superintendent, an employee of Avondale for over forty years, testified that the pontoons/barges were all built in the Harvey Quick Repair Yard and designed to Avondale's specifications. Bourgeois acknowledged that the pontoons transported workers' tools and equipment from place to place.[2]
Although their transportation function was incidental to their primary use, the barges had some design features not common to fixed, stationary platforms. They were free floating rather than permanently attached in one location; they were pulled or pushed where needed. Recessed valve bitts[3] on the corners of the barge-shaped pontoons were used when they were towed or moved or fastened together. The barges carried men wearing life vests as well as equipment.[4] They were subject to the perils of the sea, sometimes breaking loose from their moorings.
Just prior to his accident, Orgeron, a ship repairman, was working from one of Avondale's largest barges, which measured approximately sixty by twenty feet and had a two-foot draft. When Orgeron arrived at his job, the barge was abutting a smaller one. About four hours later, Orgeron took a heating torch from a co-worker and turned to hand it to another one. As he moved, he stepped into a gap which had opened between the barges, injuring his back.
The trial court concluded that plaintiff failed to carry his burden of proving that the structures on which he was working qualified as vessels under the Act. Because plaintiff did not prove vessel status, the court did not consider negligence, causation or damages. The court of appeal affirmed[5] on the ground that the structures were work platforms, which incidentally performed some transportation functions. A writ was granted to consider the judgment of the court of appeal.[6]

LAW AND CONCLUSION
The Longshore and Harbor Workers' Compensation Act provides compensation benefits to maritime employees for disability or death occurring on the navigable waters of the United States during the loading, unloading, repairing or building of a vessel.[7] Until passage of the LHWCA in 1927, this category of worker was frequently without a remedy. As a humanitarian and remedial measure, the LHWCA must be liberally construed. Director, OWCP v. Perini North River Association, 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983).
The LHWCA and the Jones Act[8] furnish mutually exclusive remedies. Swanson v. Marra Bros., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1945). The Jones Act only applies to seamen who are members *41 of a vessel's crew and aid in its navigation. Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957). A Jones Act seaman must have a more or less permanent attachment to a vessel or fleet of vessels,[9] while recovery under Section 5(b) of the LHWCA can be based upon transitory contact with a vessel.
Injured workers have a lesser recovery under the compensation remedy of the LHWCA than seamen have under the negligence action furnished by the Jones Act. Seamen have the right to maintenance and cure, the liberal remedy afforded by the Jones Act and a strict liability cause of action for unseaworthiness. The warranty of seaworthiness only applies to vessels "in navigation," and the injured worker must be engaged in traditional ship's work. Under the 1972 amendments to the LHWCA, longshore and harbor workers no longer have a remedy for unseaworthiness. However, in addition to a compensation claim against his employer, a longshore or harbor worker may bring an action under 33 U.S.C. § 905(b) against a vessel owner as a third party to recover damages for an injury caused by negligence of the vessel.[10]
Ship repair is defined as maritime employment in the LHWCA. See Director, OWCP v. Perini North River Assoc., 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983). In construing the Act's terms, "other statutes having other purposes" are of little aid. South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 260, 60 S.Ct. 544, 549, 84 L.Ed. 732, 737 (1940). Thus, the Jones Act[11] definition of the word vessel should not be substituted for the word vessel in Section 5(b) of the LHWCA.
Under general maritime law, a vessel is "every description of watercraft or other artificial contrivance used or capable of being used as a means of transportation on water."[12] This is the capability test for vessel status.
"Since Congress, in its use of the term `vessel' in §§ 902(21) and 905(b), did not provide a definition different from the generally acknowledged one found in section 3, we may presume, as other courts have, that it intended to adopt this commonly-used term.... [C]ases decided under the Jones Act, 46 U.S.C. §§ 541-713 (1976), have looked to a different test in determining what is a vessel for Jones Act purposes.... A craft need not be actually engaged in navigation or commerce in order to come within the definition of `vessel.' The question is one of residual capacity." McCarthy v. The Bark Peking, 716 F.2d 130, 134, 134 n. 2, 135 (2d Cir.1983),cert. denied, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984).
After McCarthy, Judge Tate considered vessel status under Section 905(b) in Hall v. Hvide Hull No. 3, 746 F.2d 294 (5th Cir.1984), cert. denied, 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985). Hall held that an incomplete ship floating on navigable waters during its construction is a vessel for purposes of a tort action under Section 905(b). Hall followed Lundy v. Litton Systems, Inc., 624 F.2d 590 (5th Cir.1980), cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981) and Burks v. American River Transportation Co., 679 F.2d 69 (5th Cir.1982).[13] Footnote 10 of Hall points out that the question of whether a vessel is also "in navigation" under the Jones Act is a different issue from the question of vessel status under Section 905(b). Following footnote 29 of Perini, Hall[14] decided that the remedies of *42 Act-covered employees injured on navigable waters were not affected by Executive Jet Aviation v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1952). Under Executive Jet, there is admiralty jurisdiction only when a wrong occurs on navigable waters, situs, and bears a significant relationship to traditional maritime activity, nexus.[15] See Herb's Welding, Inc. v. Gray, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). Historically, ship construction is not regarded as a traditional maritime activity: a ship under construction has not evolved into vessel status.
Richendollar v. Diamond M Drilling Co., Inc., 819 F.2d 124 (5th Cir.), cert. denied, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987) and Drake v. Raymark Indus., Inc., 772 F.2d 1007 (1st Cir.1985), cert. denied, 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986), held that a Section 905(b) cause of action must satisfy the Executive Jet requirements for admiralty jurisdiction. Richendollar, an en banc opinion from the Fifth Circuit authored by Judge Politz, decided that a ship being constructed on land was not a vessel within the admiralty jurisdiction of the federal courts because it was not in or on navigable waters and was incapable of flotation.
On its facts, Hall can be distinguished from Richendollar. The Hall hull was floating in navigable waters, and the Richendollar drilling rig was on land with holes in its hull. The Hall hull met the capability test: the Richendollar rig did not. Richendollar points out that the configuration of a watercraft is of secondary importance because size, form, equipment and means of propulsion do not determine jurisdiction.
After Richendollar, the Fifth Circuit decided Rosetti v. Avondale Shipyards, Inc., 821 F.2d 1083 (5th Cir.1987), cert. denied, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988), which held that an unfinished vessel, floating but still under construction, was not a vessel for purposes of admiralty jurisdiction or Section 905(b), because it was incomplete and therefore incapable of navigation or its special purpose use on or in the water. Rosetti and Hall cannot be reconciled: the companion cases both involved floating hulls which were still under construction.
Richendollar and Drake rejected Hall's treatment of the Executive Jet jurisdictional issue. However, that debatable question is not decisive here.[16]Richendollar and Rosetti do not control this issue of vessel status, because the barges on which Orgeron was working were not under construction. They were finished products used in the construction of other vessels. The *43 barges were capable of navigation, were afloat on navigable waters and performed a transportation function. Orgeron himself was engaged in ship repair, which has generally been regarded as a traditional maritime activity.
Ducrepont v. Baton Rouge Marine Enterprises, Inc., 877 F.2d 393 (5th Cir.1989) considered vessel status separately under the Jones Act and Section 5(b) of the LHWCA, because the term vessel in the LHWCA is not synonymous with the term vessel in the Jones Act. The structure at issue in Ducrepont was a cargo barge which had been converted into a stationary work platform and, like the platform in Davis v. Cargill, Inc., 808 F.2d 361 (5th Cir.1986), was analogized to a dry dock. The Davis platform was permanently moored, anchored to the riverbed and equipped with a permanently attached landing extension.
In affirming the trial court, the court of appeal here relied on language in Bernard v. Binnings Construction Company, Inc., 741 F.2d 824 (5th Cir.1984), which stated that the work platform at issue was moored at the time of the accident and any transportation function it performed was merely incidental to its primary purpose of serving as a work platform. The court of appeal failed to note that this language was used in the analysis of a barge as a Jones Act vessel and not as a Section 905(b) vessel. The issue of whether the barge performed a transportation function as a primary or incidental matter relates to vessel status under the Jones Act.[17]
Ducrepont held that a barge is not a § 905(b) vessel when it is firmly moored, seldom moved, not used for navigation and in use as a dry dock or stationary work platform. However, a barge is a vessel within the meaning of the LHWCA even when it has no motive power. Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931, 1944 AMC 337 (1944); The Robert W. Parsons, 191 U.S. 17, 30, 24 S.Ct. 8, 48 L.Ed. 73 (1903); Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047 (1907). The fact that these barges were pushed or pulled into various locations rather than self-propelled does not remove them from the category of § 905(b) vessels. Richendollar.
In the Fifth Circuit, the test for vessel status under Section 5(b) of the LHWCA is the capability test in 1 U.S.C. § 3, as modified by Richendollar, Rosetti and Ducrepont. Richendollar and Rosetti hold that a Section 905(b) vessel must satisfy the Executive Jet requirements for admiralty jurisdiction, a maritime situs and a significant relationship to traditional maritime activity. Ducrepont requires that a structure be sufficiently mobile to serve some transportation function for vessel status under Section 905(b).
The barges being used as work platforms by Orgeron and his co-workers were capable of transportation on water and they were floating on navigable water. The situs test is met, because Orgeron's accident occurred both on and in navigable water. The nexus test is met because the barges were being used for ship repair, a traditional maritime activity classified as maritime employment by the LHWCA. The barges have vessel status because they were used for transportation on navigable waters.
In Ducrepont, the stationary work platform was firmly moored and seldom moved. These barges were not stationary and were frequently moved. In fact, the injury occurred when the barges drifted apart. Avondale's barges meet the capability standard of 1 U.S.C. § 3. Additionally, they were designed and used for transportation as well as work platforms.
The trial court erred in concluding that these pontoons/barges were not vessels. They meet the statutory standard. They were clearly capable of transportation and moved periodically around the stretch of navigable water fronting the Harvey Quick *44 Repair Yard. They performed a transportation function.
Since the trial court did not reach the issues of negligence, causation and damages, the case is remanded to the court of appeal for consideration of those questions on the record.
For the foregoing reasons, the judgment of the court of appeal is reversed and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NOTES
[*] Editor's Note: This opinion was originally published at 556 So.2d 582. It is published here as corrected.
[1] 33 U.S.C. § 905(b) stated:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury, was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.
The accident occurred on September 9, 1983 before the 1984 amendment to subsection (b) which eliminated a vessel negligence action against an employer under this section.
[2] Q: But Mr. Bourgeois it's capable of carrying anchors and propellers around that yard and as a matter of fact, it does carry anchors?

A: Yes, it carries the repair work that we do.
Q: It carries heavy equipment around that yard; doesn't it?
A: No more than what it can handle on the wheel and rudders.
Q: Okay, but they are pretty heavy; aren't they?
A: Some of them may be eight, nine hundred pounds, maybe a ton.
Q: When these things move around the yard, Mr. Bourgeois, don't they have the workers' tools on them, sir?
A: They do have.
Q: These things are never permanently anchored in place; are they, sir?
A: Not permanently, no.
Tr. 296-97.
[3] "A single or double post of metal or wood fixed on the deck of a ship and around which mooring lines or other lines are made fast." Webster's Third New International Dictionary 223 (1976).
[4] Q: Were life vests ever used by anyone on these barges?

A: You were always required to use life vest when you was on that pontoon and it was moving. Tr. 352.
[5] 542 So.2d 640 (La.App. 5 Cir.1989).
[6] 550 So.2d 619 (La.1989).
[7] 33 U.S.C. § 903(a).
[8] 46 U.S.C.App. § 688.
[9] Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067 (5th Cir.1986).
[10] In a negligence suit against a vessel under 33 U.S.C. § 905(b), liability of the vessel is not "based upon the warranty of seaworthiness."
[11] 46 U.S.C.App. § 688.
[12] 1 U.S.C. § 3.
[13] Hall distinguished Lowe v. Ingalls Shipbuilding, A Div. of Litton, 723 F.2d 1173 (5th Cir. 1984) and Hollister v. Luke Construction Co., 517 F.2d 920 (5th Cir.1975), which did not involve Section 905(b) actions.
[14] Footnote 29 of Perini states:

Perini cites our decision in Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 34 L.Ed.2d 454, 93 S.Ct. 493 (1972), and argues that the LHWCA is premised upon admiralty jurisdiction, which requires a connection between an employee and traditional maritime activity. Perini's reliance on Executive Jet is misplaced. In that case, the only issue before the Court was whether federal admiralty jurisdiction extended to tort claims arising out of the crash of an airplane into navigable waters on a flight "within the continental United States, which [is] principally over land." Id., at 266, 93 S.Ct., at 493, 34 L.Ed.2d, at 454. Jurisdiction in Executive Jet was predicated on 28 U.S.C. § 1333(1) [28 U.S.C.S. § 1333(1)], which provides that the federal district courts have original and exclusive jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction."
The explicit language of Executive Jet makes it clear that our discussion was occasioned by "the problems involved in applying a locality-alone test of admiralty tort jurisdiction to the crashes of aircraft" in a situation where "the fact that an aircraft happens to fall in navigable waters, rather than on open land, is wholly fortuitous." 409 U.S., at 265, 266, 93 S.Ct., at 503, 504, 34 L.Ed.2d, at 465, 466. Although the term "maritime" occurs both in 28 U.S.C. § 1333(1) [28 U.S.C.S. § 1331(1)] and in § 2(3) of the Act, these are two different statutes "each with different legislative histories and jurisprudential interpretations over the course of decades." Boudreaux v. American Workover, Inc., 680 F.2d 1034, 1050 (CA5 1982) (footnote omitted). In addition, Churchill, as a marine construction worker, was by no means "fortuitously" on the water when he was injured. 459 U.S., at 320, 103 S.Ct., at 648-49, 74 L.Ed.2d, at 482-83.
[15] As a result of Richendollar, Hall is no longer a reliable precedent with regard to jurisdiction. Molett v. Penrod Drilling Co., 872 F.2d 1221 (5th Cir.1989).
[16] Since ship construction is defined as maritime employment in the LHWCA, it is questionable whether the traditional view that ship construction is not a subject of maritime jurisdiction should apply to any part of the Act. See Perini and Hall.
[17] Bernard involved vessel status under the Jones Act. Bernard held that a work pontoon which was not designed for navigation and not in navigation, was not a Jones Act vessel as a matter of law. Since Bernard turned on the Jones Act "in navigation" issue, which is extraneous to the LHWCA, the court of appeal erred in considering Bernard.