# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1284
_____

United States of America,                    *
                                             *
          Appellee,                          *
                                             *
     v.                                      *
                                             *
Rush Templeton,                              *
                                             *
          Appellant.                         *
_____

No. 02-1286
_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

United States of America,                    *
                                             *
          Appellee,                          *
                                             *
     v.                                      *
                                             *
Warren Spielman,                             *
                                             *
          Appellant.                         *
_____

No. 02-1510
_____

United States of America,                    *
                                             *
          Appellant,                         *

                                        *
        v.                              *
                                        *
Rush Templeton; Warren Spielman,        *
                                        *
        Appellees.                      *
    _____

        No. 02-1285
    _____

United States of America,               *
                                        *
        Appellee,                       *
                                        *
        v.                              *
                                        *
Venetian Harbor, Inc.,                  *
                                        *
        Appellant.                      *
    _____

        Nos. 02-2775/2918
    _____

United States of America,               *
                                        *
        Appellee/Cross Appellant,       *
                                        *
        v.                              *
                                        *
Jared Lee Bonbrake,                     *
                                        *
        Appellant/Cross Appellee.       *

_____

Submitted: March 11, 2004
Filed: July 28, 2004
_____

Before RILEY and MELLOY, Circuit Judges, and ERICKSON,[1] District Judge.
_____

RILEY, Circuit Judge.

Venetian Harbor, Inc. (VHI), Warren Spielman (Spielman), Jared Lee Bonbrake (Bonbrake), and Rush Templeton (Templeton) (collectively, appellants) were convicted of knowingly discharging raw sewage in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A), and Spielman, Bonbrake, and Templeton were also convicted of conspiring to discharge raw sewage in violation of 18 U.S.C. § 371. The discharges occurred from a towboat moored on the Mississippi River and used as a restaurant, bar, and gas station. The appellants moved for judgments of acquittal at the close of the government's case and at the end of trial. Because the Clean Water Act, 33 U.S.C. §§ 1251-1387 (Act), does not provide criminal penalties for such discharges from "vessels," and we conclude the towbarge in this case is a "vessel," we reverse the district court's denial of the appellants' motions for judgments of acquittal.

## I.  BACKGROUND

Although the relevant facts of this case are relatively undisputed, we present the evidence in the light most favorable to the government. VHI, Spielman, Bonbrake, Templeton, and Thea Preston (Preston) were all involved at one time or another in a business called The Tavern on the Rand ("Tavern"). The Tavern was a

[1]The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota, sitting by designation.

restaurant and bar located at VHI, a marina on the Mississippi River near Portage Des Sioux, Missouri. The Tavern was built on a towboat, the Frank C. Rand (Rand), which was moored at VHI. Spielman was VHI's president, and Bonbrake was its vice president. Templeton leased the Rand and operated the Tavern in 1998 and 1999.

The Rand is a 166-foot towboat with a steel hull and superstructure manufactured in 1946, and was used as a tow barge until it fell into disrepair in the late 1980s and was decommissioned. In 1994, Spielman purchased the Rand from American Milling Company for $65,000 on VHI's behalf, buying the vessel "where is, as is" because the Rand had been stripped of many of its parts. VHI spent approximately $39,000 to clean, replate, and chemically certify the Rand while in drydock. After the repair work was completed, the Rand was towed to VHI and tied to a gas dock.

The Rand was moored about fifteen feet from the shore. Two spud poles, attached with a total of eighteen removable bolts, kept the Rand from drifting away. Her radar was left onboard, her smoke stacks were left intact, she floated on her own, and her onboard engines could have been rebuilt with sufficient funds. Spielman and Bonbrake decided to install a new sewage system and, after an overhaul, the air tanks formerly used to start the engines were converted into sewage tanks by David Aten (Aten), a VHI employee. Two discharge pipes on the side of the Rand allowed licensed waste haulers to pump out waste. Leaks from the tanks would run down to the bilge, which also contained wastewater. The bilge water was pumped overboard at least twice while Aten worked for VHI. Bonbrake and Spielman had licensed waste haulers pump out the tanks at least three times, but eventually they instructed Aten and Preston to dump the waste into the river. Templeton also pumped waste into the river. Waste was discharged into the river from one to three times per week.

On August 31, 1999, Special Agent Andrew McFarlane (Special Agent McFarlane) of the United States Environmental Protection Agency (EPA), Criminal

Investigation Division visited Spielman at his office in Portage Des Sioux to investigate sewage discharge from the Rand. Spielman said he had little to do with the Rand because Templeton leased the Rand, but Spielman informed Special Agent McFarlane he believed pumper trucks were used to dispose of the waste. On September 1, 1999, Special Agent McFarlane again discussed with Spielman the Rand's status, and Spielman explained he was trying to get the Rand back, but Templeton still possessed it. Special Agent McFarlane later returned when he learned Spielman had changed the locks to the Rand and, with Spielman's consent, boarded the Rand and began photographing the exterior. Special Agent McFarlane discovered a water pump with a three-foot hose in the bilge area. Special Agent McFarlane tracked Templeton down on his houseboat, and Templeton denied any illegal dumping. Later, Special Agent McFarlane visited Bonbrake, the Rand's former manager, who said he also believed pumper trucks were used to discharge sewage from the Rand.

The government indicted VHI, Spielman, Bonbrake, Preston, and Templeton for conspiracy to violate and knowingly violating the Act. A superceding indictment charged all the defendants with conspiring to discharge pollutants illegally, in violation of 18 U.S.C. § 371, and knowingly discharging pollutants, in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A). Preston pled guilty, and the remaining defendants proceeded to trial.[2]

At the close of the evidence at trial, the court denied the appellants' motions for judgment of acquittal, ruling the Rand was not a "vessel" as a matter of law, but

[2]The second scheduled day of trial was September 11, 2001. After the terrorist attacks that day, the district court cancelled court for September 11-12, 2001. The trial resumed on September 13, and the defendants moved for a mistrial due to (1) an overwhelming sense of unity in favor of the United States; (2) lack of focus from the jury due to the break in the trial; and (3) evacuations of the federal courthouse on two later occasions. The district court denied the motions.

submitting the question to the jury as a possible affirmative defense. After a seven-day trial, the jury found the appellants guilty. The district court (1) placed VHI on probation for five years and ordered it to pay a $90,000 fine; (2) sentenced Spielman to ninety days in prison, three years supervised release, and a $90,000 fine; (3) sentenced Bonbrake to a one-day prison term with credit for time served, three years supervised release, and a $20,000 fine; and (4) sentenced Templeton to thirty days in prison, two years supervised release, and a $10,000 fine.[3] VHI, Spielman, Bonbrake, and Templeton appeal the district court's ruling that the Rand was not a vessel under the Act.[4]

## II.    DISCUSSION
### A.    Standard of Review

Initially, we note a dispute as to the applicable standard of review we should apply to the district court's ruling that the Rand is not a vessel under the Act. The appellants assert the district court's refusal to dismiss the indictment was an error of law, and that no party disputes the relevant facts surrounding the Rand's status. The appellants claim the dispute revolves around the legal conclusion to be drawn from those facts.

Conversely, the government contends the court properly submitted the question about the Rand to the jury, which decided the Rand is not a vessel. The government

---

[3]After trial, the Rand was towed approximately three hundred miles to the Lazy River Marina in Savannah, Illinois.

[4]The appellants also appeal the district court's denial of their motion for inquiry into the jury's verdict under Federal Rule of Evidence 606(b) to determine whether outside influences came to bear on any juror. The government cross-appeals the district court's (1) denial of sentencing enhancements for the individual defendants, and (2) the grant of downward departures to the individual defendants. In light of our holding on the Rand's status as a vessel and our reversal of the appellants' convictions, we need not address these other issues.

argues the court included the Act's definition of the term "vessel" in the jury instructions, and the defendants did not object, thus waiving this objection such that our review should be for plain error. United States v. Woodard, 315 F.3d 1000, 1004 (8th Cir. 2003).

The appellants, in turn, argue they requested the jury instruction as a last-ditch effort after the district court denied their motions for acquittal on the legal issue of whether the Rand was a vessel. The appellants do not argue the jury instruction as given was erroneous, because it mirrored 1 U.S.C. § 3. Instead, they argue the jury should not have been permitted to answer the question about the Rand's status. The appellants further contend they did not submit the issue of the Rand's status as an affirmative defense, and the government has not offered caselaw to support its argument that the issue of the Rand's status is an affirmative defense to be determined by the trier of fact. Finally, the appellants note the central case on which the government relies ruled the interpretation of a statute is reviewed de novo. See United States v. West Indies Transp., Inc., 127 F.3d 299, 307-08 (3d Cir. 1997).

Because the issue before us involves a question of statutory interpretation, our review is de novo. United States v. Sumlin, 317 F.3d 780, 781 (8th Cir. 2003); see also West Indies, 127 F.3d at 308-09 (conducting de novo review of statutory interpretation of 33 U.S.C. § 1322); United States v. Brittain, 931 F.2d 1413, 1418 (10th Cir. 1991) (conducting de novo review of the legal question of interpretation of 33 U.S.C. §§ 1311(a), 1319(c), and 1362(5)).

### B.     The Rand as a "Vessel"

Congress enacted the Act to restore and maintain the biological, chemical, and physical integrity of our country's waters. 33 U.S.C. § 1251. The Act prohibits, with certain exceptions, the "discharge of any pollutant by any person." 33 U.S.C. § 1311(a). Although "sewage" is considered a pollutant under the Act, "sewage from vessels" is excluded from the definition of a "pollutant." 33 U.S.C. § 1362(6). Thus,

if the Rand qualifies as a vessel, the appellants did not violate the criminal provisions of the Act, and we must reverse their convictions. West Indies, 127 F.3d at 309.

The Act's definitions of both new and existing vessels "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on the navigable waters." 33 U.S.C. § 1322 (a)(1)-(2). This definition is identical, in all relevant respects, to the definition contained in the General Provisions of the United States Code. 1 U.S.C. § 3 (defining a vessel as a "watercraft . . . used, or capable of being used, as a means of transportation on water").[5] The General Provision's definition has been used in the context of numerous other federal statutes, including the Shipping Act, 46 U.S.C. § 2101(45) (stating vessel has the same meaning as under 1 U.S.C. § 3), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601(28) (using same definition as 1 U.S.C. § 3, with minor grammatical changes), and the Interstate Commerce Act, 49 U.S.C § 13102(21) (using same definition as 1 U.S.C. § 3, and adding watercraft "intended to be used, as a means of transportation by water").

Only one circuit has addressed the statutory definition of "vessel" in the specific context of the Act. West Indies, 127 F.3d at 309. Despite the scarcity of caselaw regarding the meaning of "vessel" under the Act, an abundance of caselaw analyzing the vessel definition under similarly worded statutes exists. Arguably, Congress intended the definition in the Act to be interpreted in the same way as the definition contained in 1 U.S.C. § 3. Cf. McCarthy v. The Bark Peking, 716 F.2d 130, 134 (2d Cir. 1983) (noting Congress's use of the term "vessel" in the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), without

_____

[5]"This language, without substantial change, was taken from an act of Congress passed in 1866 for the prevention of smuggling, 14 Stat. 178. It took effect in its present form, under Title 1 of the United States Code, as part of the Act of July 30, 1947, 61 Stat. 633." United States v. Forester, 8 M.J. 560, 563 n.2 (N.C.M.R. 1979).

providing a definition different from that found in 1 U.S.C. § 3, evidences Congress "intended to adopt this commonly-used term"). We will interpret the term "vessel" under the Act consistently with previous interpretations of 1 U.S.C. § 3, because both identically define the term "vessel." Cf. United States ex rel. Zissler v. Regents of the Univ. of Minn., 154 F.3d 870, 875 (8th Cir. 1998) (citation omitted) ("Where Congress uses the same form of statutory language in different statutes having the same general purpose, courts presume that Congress intended the same interpretation to apply in both instances."); West Indies, 127 F.3d at 309 (reviewing "vessel" according to "long-standing interpretation of the term 'vessel' in other contexts").

Reviewing the caselaw regarding the definition of "vessel" convinces us the Rand fits within that definition. In McCarthy, 716 F.2d at 134, the Second Circuit stated, "Pursuant to the axiom that 'vessels' must be at least capable of use as a means of transportation on water, courts uncertain of a particular craft's place in nautical taxonomy have drawn distinctions based on the presence or absence of [] residual capacity. At the same time, however, virtually any capacity for use as seagoing transportation–perhaps even the hypothetically plausible possibility–has sufficed to lend the dignity of 'vessel' status to a host of seemingly unlikely craft." Id. (citations omitted). "A craft need not be actually engaged in navigation or commerce in order to come within the definition of 'vessel.' The question is one of residual capacity." Id. at 135; see also Farrell Ocean Servs., Inc. v. United States, 681 F.2d 91, 93 (1st Cir. 1982) ("[A] qualifying 'vessel' is one that is capable of use as a vessel even if not functioning as such at the moment in question."). As the Fifth Circuit observed over twenty years ago, "[n]o doubt the three men in a tub would also fit within our definition [of a 'vessel' under 1 U.S.C. § 3], and one probably could make a convincing case for Jonah inside the whale." Burks v. Am. River Transp. Co., 679 F.2d 69, 75 (5th Cir. 1982).

The government argues the Rand was not a vessel because its engines did not work, requiring it to be towed. Inoperable engines and towing are not sufficient to

disqualify the Rand as a vessel. In <u>Pleason v. Gulfport Shipbuilding Corp.</u>, 221 F.2d 621, 623 (5th Cir. 1955), the Fifth Circuit applied 1 U.S.C. § 3 in a maritime lien case and concluded the Carol Ann was a vessel. The Carol Ann's "propellers and propeller shafts had been removed"; she did not have her own "light, heat, or power in operation"; her primary engines had been removed; her steering apparatus, aside from the rudder, had been removed; and none of her remaining machinery worked; but her superstructure was intact; and her navigation lights remained in place, though inoperable. <u>Id.</u> at 622-23. The Carol Ann had been towed across the Gulf of Mexico without a crew, motive power, or operative steering. <u>Id.</u> at 623. At her final destination, the Carol Ann was moored to a dock with steel cables and ropes and used for receiving shrimp for storing, freezing, processing, and resale, similar to a plant that would operate on land. <u>Id.</u> Electric and telephone lines were connected to the Carol Ann, although she had a power system of her own. <u>Id.</u> Regardless of these land-bound attributes, the court concluded the Carol Ann was plainly a vessel. <u>Id.</u>

In discussing 1 U.S.C. § 3, the Fifth Circuit places emphasis on the phrase "capable of being used." <u>Campbell v. Loznicka</u>, 181 F.2d 356, 358 (5th Cir. 1950). The court in <u>Campbell</u> stated the question of whether a yacht called the Scorpio had ever sailed the seas or transported any commerce did not control whether it was a "vessel." <u>Id.</u> at 359. Concluding the Scorpio was indeed a "vessel," the court observed, "Undoubtedly, it was a type of water craft, long afloat, readily towable, and entirely capable of being used, even if inefficiently, in transportation, . . . and was a 'vessel' within the wording of the statute, and within the intent and purpose of the law." <u>Id.</u>

The government argues we should follow the analysis from <u>West Indies</u>, wherein the Third Circuit concluded a permanently moored barge was not a vessel under the Act. At first glance, <u>West Indies</u> appears to support the government's position. However, closer inspection indicates otherwise. In <u>West Indies</u>, 127 F.3d at 309, the defendants were convicted for discharging sewage into a bay from a barge.

-10-

The Third Circuit affirmed the convictions, ruling the barge, used to house workers, was not a vessel because it was moored permanently to the shore, could not have been used for transport because it was halfway submerged "with part of [its] hull resting on the bottom" of the bay, had water visible below deck, and "could not be moved from its mooring." Id. In contrast, the Rand was not permanently moored, was floating and had no part of its hull resting on the river bed, and could be moved easily.

The government also cites Kathriner v. UNISEA, Inc., 975 F.2d 657, 660 (9th Cir. 1992), for support. In Kathriner, the Ninth Circuit ruled the UNISEA, a former liberty ship converted into a floating fish processing plant, was not a "vessel in navigation" under the Jones Act because it was permanently moored and had no movement capabilities, and had no means of navigation, no independent source of propulsion, and no transportation function at all. Id. Just as with West Indies, Kathriner is distinguishable. First, the definition of "vessel in navigation" under the Jones Act is not as expansive as the general definition of "vessel." Compare Morehead v. Atkinson-Kiewit, J/V, 97 F.3d 603, 607 (1st Cir 1996) (noting the general definition of "vessel," under 1 U.S.C. § 3 "is significantly more inclusive than that used for evaluating seaman status under the Jones Act"), with Kathriner, 975 F.2d at 659, 662 (stating seaman status under the Jones Act requires a plaintiff prove he was aboard a "vessel in navigation," and observing the definition from 1 U.S.C. § 3 is the one most courts use for purposes of the LHWCA). The present case does not present us with the question of whether the Rand was a "vessel in navigation" under the Jones Act. Furthermore, the UNISEA had permanent utility connections and was "designed as a floating factory–merely extending land over water for the purpose of increasing the usable space of a dock-side fish processing operation," and "when the UNISEA was converted to a shrimp processing plant, a large opening was cut into her hull to allow for dock traffic," and if put to sea, "she would surely sink." Id. at 660. The Rand, in contrast, was attached to two spud poles by eighteen bolts,

-11-

which could easily be removed, permitting the Rand to be towed because she floated on her own, which is sufficient to bestow "vessel" status on her.

The government also claims the Rand is not a vessel because VHI advertised the Rand as a permanently moored facility. We reject this argument as the Second Circuit rejected a similar argument in McCarthy, where it concluded the Peking remained a vessel despite her age and current use. McCarthy, 716 F.2d at 135-36 & n.6. The court observed the Peking "was capable of being towed, welded rudder notwithstanding," was not subject to United States Coast Guard inspections, and its owners did not intend to return the Peking to active navigation. Id. Regardless, noting the expansive scope given the section 3 definition of "vessel," the Second Circuit held the Peking was a vessel under the LHWCA. Id. at 136.

While we are aware "[t]he fact that it floats on the water does not make it a ship or vessel," Cope v. Vallette Dry-Dock Co., 119 U.S. 625, 627 (1887), the facts in this case lead to the conclusion the Rand was a vessel under the Act. We fully appreciate the government's arguments, but if we were to adopt the government's definition of the term, "capable of use," we would have to equate the term to mean "current use," an interpretation the statutory language and the caselaw do not support. The Rand was "capable of use" as a vessel, albeit under tow. While it may have been inefficient or expensive to use the Rand as a vessel, those factors do not serve to strip the Rand of its vessel status. See Campbell, 181 F.2d at 359. The Rand fits "into the category of many other vessels with similarly limited capacities." McCarthy, 716 F.2d at 135. Although the Rand probably will never "slip her moorings" and set off toward open waters, she is nonetheless a towable vessel capable of use as a means of transportation on water. Id. at 136.

If the Act's exception for "sewage from vessels" were meant to apply only to vessels currently in navigation, as the government urges the statute's plain meaning does, Congress could have defined the exception accordingly. It did not, and we

-12-

refuse to deviate from years of precedent interpreting the term "vessel" to include craft like the Rand.  See Springer v. Gov't of Philippine Islands, 277 U.S. 189, 201-02 (1928) ("[A]s a general rule inherent in the American constitutional system, . . . the judiciary cannot exercise . . . legislative power").  The "expansive scope" given to the definition of "vessel" under 1 U.S.C. § 3, McCarthy, 716 F.2d at 136, leads to the inescapable conclusion the Rand was a vessel under the Act.

## III.  CONCLUSION

For the reasons stated, we reverse the convictions of VHI, Spielman, Bonbrake, and Templeton.

_____