### THE O'BOYLE NO. I.

Petition of ANTHONY O'BOYLE, Inc.

District Court, S. D. New York.
July 5, 1945.

Macklin, Brown, Lenahan & Speer, Leo F. Hanan and Richard S. Leahy, all of New York City, for petitioner.

Alexander & Ash and Edward Ash, all of New York City, and Nicholas Milano, of Long Island City, for Shamrock Towing Co., and as owner of scow Colonel G.

Robert Moers and Jacob Rassner, both of New York City, for claimant Fichter Steel Corporation.

KNOX, District Judge.

Anthony O'Boyle, Inc., owner of the floating crane O'Boyle No. 1, here seeks a limitation, or exoneration, of liability, growing out of an accident that occurred on the East River on March 19, 1943.

Generally speaking, the facts are these—

In June of 1942, Fichter Steel Corporation was about to engage in some construction work for the United States Navy at the foot of North First Street, nearby the Brooklyn Navy Yard. In carrying out the project, it required the use of a Lidgerwood hoist, that weighed something more than 13 tons. The hoist was then located at a point in the Bronx, and the Steel Corporation hired petitioner's crane O'Boyle No. 1, for the purpose of lifting the hoist on to a scow for transportation to the site where it was to be used. On arrival there, the O'Boyle No. 1 again lifted the hoist and swung it into the desired position. Both of these transfers were carried out in good order, and without incident.

On March 19, 1943, the Fichter Corporation, having finished its contract at the Navy Yard, again wished to move the hoist, and the O'Boyle No. 1, and its crew of two men, was once more hired to lift the hoist from its then position and place it on board the barge Colonel G which lay at a pier end alongside the O'Boyle crane.

The task of dismantling the hoist, and of transferring its component parts on to the barge, was under the supervision and control of two men, one named Hagg, and the other Munson, foreman and assistant foreman, respectively, of the Fichter Corporation. They had the assistance of a gang of eight other employees of the steel corporation. When these men had removed certain appurtenances of the hoist, and had fitted its main body with supporting slings, Munson signaled the operator of the O'-Boyle to hoist away. The machine was then lifted a short distance above its emplacement—some 30 feet or more above the water—where it was momentarily held to see if all slings were properly arranged. Everything appearing to be in good order, the hoist was then lifted to a higher level, preparatory to being swung into position over the Colonel G. This required a circular movement of about 180 degrees. On receipt of a signal for the swing to be made, the operator of the O'Boyle, according to Hagg, "started off slowly and then all at once * * * come around fast and then he checked it suddenly." As he did so, the boom buckled at a point about 15 feet above the base of the boom on which it was supported. The result was that the hoist fell to the deck of the Colonel G. As can be imagined, that craft, together with the hoist, were badly wrecked. Quite remarkably, however, none of the persons engaged in the operation was injured.

Following the accident, Shamrock Towing Company, Inc., as owner of the Colonel G, filed a libel against Anthony O'Boyle, Inc., and Fichter Steel Corporation, as charterer of the barge. In that proceeding, Anthony O'Boyle, Inc., appeared and answered. It is also impleaded the United States upon the theory that two of its naval vessels were responsible for the accident. It likewise filed a libel against Fichter Steel Corporation, as charterer of the O'Boyle No. 1, and against the United States, to recover damages for the injury that came to its crane. During the pendency of the libels, Anthony O'Boyle, Inc., filed its petition in the instant proceeding. In response thereto, Shamrock Towing Company, Inc., as owner of the Colonel G, made answer and filed a claim for damages. Fichter Steel Corporation also filed a claim, but up to the time of trial, it had filed no answer to the allegations contained in the petition now before the court.

Owing to the inability of the United States to produce its witnesses, the original actions instituted by Shamrock Towing Company, Inc., and Anthony O'Boyle, Inc., were continued, pending the disposition of the limitation proceedings.

In its application for limitation of liability, petitioner asserts, of course, that it was without fault, and seeks to explain the accident by saying that, just as the hoist was being swung, two Navy P.T. boats sped past the O'Boyle, and that their swells caused the barge to pitch and toss with such violence that the resulting strains overcame the strength of the crane's boom.

It appears, however, that about February 20, 1943, the crane, while loading a pill box onto a ship, had suffered an injury that required repairs which were made by a boilermaker, named Heipershausen. In overhauling the boom, he installed 22 feet of 3″ x 3″ new angle iron, a like number of feet of 3 x 5 inch angle iron, and about a hundred pounds of rivets. A quantity of angle iron that had formerly composed portions of the boom was faired and reinserted in the apparatus. In making these repairs, many of the boom's rivets had to be removed. This was accomplished by burning them out of the plates with an acetylene torch. This method of removal, claimants contend, had the effect of weakening the steel, and that this impairment was responsible for the collapse of the boom.

In order to burn rivets out of steel plates, a very high degree of heat is required, and the temperature thus generated to a considerable extent—and depending somewhat on the accuracy with which the work is done—is transmitted to the adjacent metal. So, also, in the process of burning, the rivet holes themselves are sometimes enlarged, particularly when the torch is not mechanically held. Due to such enlargement, the strength of the margin of overlapping plates may definitely be lessened.

From the testimony as a whole, it fully appears that the best method of removing rivets from steel that is to be reused is to cut off the rivet heads, and then drive or drill the rivets from the plates. However, this was not done, and Heipershausen testified: "You can't get a man to cut out a rivet by hand, or even drill them out. They won't do it." "It is, therefore," he added, "common practice to burn out rivets in both boiler and structural steel work." According to him, in all his 49 years of handling metal, he has never observed any bad effects from this practice.

Following the failure of the boom on the O'Boyle No. 1, and on March 29, 1943, it was examined by Alexander Gobus, a metallurgist, employed by Sam Tour, Inc. He was previously in the service of Doehler Die Casting Company and of American Car and Foundry. His inspection was made at petitioner's request, and for the purpose of selecting specimens of the steel that would be of help in laboratory tests to determine the cause of the boom's inability safely to carry its load. However, he found the wreck to be so complete that he would have had to take a considerable number of specimens in order to reach a satisfactory conclusion. Since the laboratory examination of such a supply of specimens as was necessary would be costly, he decided, after talking with a representative of petitioner, to take none. He did, nevertheless, look at the twisted and bent fractures in the angle irons. While some of these had become somewhat rusty, they all "indicated good metal quality." So far as he could see, none of the metal had cracked, even at the maximum bends, and from his inspection, he concluded that any metal that could withstand such twisting was of good commercial quality. He was unable, notwithstanding, to express an opinion as to what had caused the structure to give way. During his examination, he observed portions of the boom that had been cut away by burning, following the accident. These looked like normally torch cut metal, and so far as general upkeep was concerned, the frame work was in good condition, and adequately protected from rust by good paint. On being asked if the burning out of rivets by an acetylene torch would have any ill effect on the quality of the surrounding metal, he answered that the burning of steel with oxyacetylene often causes a metallurgical change which is apt to be beneficial as anything else, and in his judgment, the practice is not harmful to mild structural steel. He did, however, concede that when steel is "burned" it cannot be cured. In the course of the examination, his notes bearing upon his inspection of the crane went into evidence. One of the statements contained therein is that "Most breaks in angles through rivet holes * * *". In view of the testimony about to be quoted, the notation made by Gobus would seem to have important significance.

Christian Frederick Wolff, an experienced engineer, and an alumnus of Massachusetts Institute of Technology, and who was called by Fichter Steel Corporation, had this to say: "When the rivet is burned out, it is a hand operation, and the human element enters into it in such a way that the territory or space around the rivet may be damaged by the burning operation, because of the fact that a man can't hold his torch too steady at the right point, and he may enlarge the hole or otherwise damage it. Of course, the heating of that territory, what I used to call 'burning,' would occur there."

Kapelsohn, the chief engineer and general superintendent of Fichter Steel Corporation, and a man of wide experience in handling structural steel, testified, in part, as follows: "The derrick gave way because of the fact that the steel at the point where it had crumpled was actually rotten, and it had rotted because of the application of heat at the point, and there were signs of the application of heat to the steel where the rivets had been burned out in making some repairs to the boom at that point; the burning out of the rivets had destroyed the structure of the steel * * * and had made it, as I said before, rotten to the extent that the grains of steel had been burned and fused to change their entire characteristic, to make them of the nature of lead, softness of lead. * * * It is a loss of temper in the steel."

He also declared that the engineers of the Board of Transportation of the City of New York, the American Railway Engineering Association, and the American Association of State Highway Engineers, forbid the use of heat in removing rivets from steel that is to be used in bearing live and dead loads.

This testimony, to my unscientific mind, would be more impressive, had the witness not said that the heating of mild steel causes it to lose its temper. My consideration of the proof leads me to believe that mild or soft structural steel contains little or no temper. And in this connection, it is to be observed that in Volume 20, page 535 of the 1943 Edition of the Encyclopaedia Britannica, the following statement may be found: "Mild steel is very tough and ductile, and differs from the hard steel out of which tools are made, in that it will not take a temper; i. e., if heated and plunged into oil or water, the sudden cooling has very little effect upon it, whereas with tool steels a great change takes place—the steel becoming very hard and usually brittle * * *".

From all this, I am fairly satisfied that, in and of itself, the use of intense heat in removing rivets from petitioner's crane when it underwent repair, had it been skillfully done, would not be likely to bring about the failure of the device to carry its load. At the same time, I am deeply impressed by the possibility that, in the course of burning out the rivets, some of the surrounding metal may have been carelessly burned away and that the marginal strength of the angle irons was thereby impaired. In this connection, it is to be noted that the making of the repairs was a "rush" job. In order that the crane might be ready for service on February 23, 1943, the whole of February 22d—a holiday—was used in bringing about their completion. For doing this work, Heipershausen charged petitioner the sum of $288.91 for 173 hours of overtime. The remainder of the bill amounted only to $94.22.

As bearing upon the theory that, due to the enlargement of rivet holes, the strength of the surrounding steel was weakened, attention should be called to the fact that petitioner's exhibit 4, which is a photograph of the collapsed boom, clearly shows that one of its cross-pieces, at each of its ends, had broken away from the rivets to which they had been attached.

But, whatever the basic cause, the structure gave way at or near the point at which the repairs were made and that is fairly persuasive evidence that something was wrong with the work that was done upon the boom. While counsel for the respective parties draw opposing inferences from the testimony, as to the exact point at which the boom first buckled, the matter is satisfactorily resolved by petitioner's witness Wilson, the man who supervised the repair job. In the course of his testimony, he was asked: "Is it fair to say that there was a bend and a twist when you saw her on March 19, 1943, at the place that had been repaired in February 1943?" His answer was: "There was some bend there, yes."

It is also the fact that following the repairs, no critical inspection or test of the crane was made in order to determine if it was then capable of handling a dynamic weight of 13 tons. The heaviest burden to which it was subjected between the completion of the repairs, and the date of the

accident, was from six to eight tons in weight. It seems to me that petitioner, when it knew, as it did, that the crane was to carry a machine of almost twice those weights, should have been at pains to be certain that its former weight carrying capacity had not been impaired. This is particularly true when, as the crane operator testified, the surface of the water was so rough as to cause the float to surge and toss, and that, due to this, the operation was a dangerous procedure to carry out.

As bearing upon petitioner's claim that two P.T. Boats went by the float at the time the hoist was suspended from the boom, and that the swells occurring therefrom brought about the disaster, the testimony of the craneman is illuminating. He was asked: "What I would like to have you tell me as definitely as you can, is, when you started to lower away, you got a swell that was of greater dimension and momentum than those you had been experiencing up to that time?" He replied: "No, about the same." To this, he added: "As I was starting to lower down * * * with the release, it come a swell—it was rough in there any way, and not from the weather; it was from the general traffic in the East River, and it doesn't matter how far the boats was away from the shore, when those swells come in they will rock a crane or a lighter or anything you got on it, and that is what happened. When I started to lower the load the crane started rocking. There is no possible chance for me to stop it from rocking. * * *"

This testimony, to my mind, is quite enough to dispose of petitioner's explanation of the accident. Had two "P.T." boats passed the scene of the disaster immediately before it occurred, their swells would have been of much greater size than those arising from "general traffic in the East River." Furthermore, the boats themselves would have been both seen and heard by most, if not all, of the witnesses.

■ If, by reason of the roughness of the water on the day of the accident when the operation in question was inherently dangerous, and it was, therefore, an act of negligence to proceed therewith, the fault, I should think, would be that of Fichter Steel Corporation, and not that of petitioner. Briggs, Inc., v. New York Public Library, 260 App.Div. 218, 20 N.Y.S.2d 977; Di Stefano v. Anthony O'Boyle, Inc., 263 App.Div. 878, 32 N.Y.S.2d 212. I say this for the reason that petitioner, for a compensation of $120 per day, had merely put its equipment, and two of its men, at the disposal of the steel company, and had not itself undertaken to perform the task of handling the hoist in a safe and satisfactory manner. It was, accordingly, without responsibility for any negligence on the part of the craneman in proceeding with the work. But, in my opinion, he is not properly chargeable with negligence, notwithstanding roughness of the water. The swells that made the work "a dangerous procedure," were not from the weather and, as I have found, they were not occasioned by passing P.T. boats. They were, as the craneman said, "from the general traffic in the East River," and these, the O'Boyle No. 1, together with its boom, should have been strong enough to withstand.

■■ Petitioner argues, in this connection, that the question of seaworthiness or unseaworthiness of its boat and equipment is not here involved. This is said to be so inasmuch as the O'Boyle No. 1 is neither a cargo carrying vessel, nor one that had been chartered for such use. She was, nevertheless, a piece of floating marine equipment that was hired out to the steel company as being capable of satisfactorily performing a particular piece of work; and she was, undoubtedly, a vessel within the admiralty jurisdiction of the court. The Sallie, D.C., 167 F. 880; Warren & Arthur Smadbeck, Inc. v. Heling Contracting Corp., 2 Cir., 50 F.2d 99. It matters little, therefore, whether her incapacity for the work that was to be done be labeled unseaworthiness or downright unfitness for the job. The fact is, she fell short of conforming to the warranty that accompanied her hiring, or charter, to the steel corporation. For this failure, I think petitioner should be held responsible.

As has been noted, petitioner's foreman, Wilson, by name supervised the repairs to the boom of the O'Boyle No. 1. He corroborates the other witness who testified that the repairmen "had to burn out the old rivets that was in the boom before they could connect it up and drive rivets." He also knew that the work was "rushed" in order that the boat could work on February 23, 1943. And yet, following the repairs, the most he could say about the boom was that "It was O. K. Everything was all right after we got it repaired." So far as this record reveals, that conclusion was based on nothing more than hope, desire

and belief, supported only by a visual inspection of the boom. True enough, the appliance thereafter successfully carried loads weighing from six to eight tons, but this certainly was no assurance that it could safely carry a weight nearly twice as heavy. Nonetheless, the officers of petitioner, who were themselves aware of the repairs, and who had subjected the boom to no other test, knowingly hired it to the steel corporation to do a job of that size. Under these circumstances, I am unable to say that the accident came about without the privity or knowledge of petitioner.

■ The argument that Fichter Steel Corporation had inspected the O'Boyle No. 1 and had accepted it as fully fitted for the work to be done will not bear analysis. When, in 1942, that company first hired the boat, its engineer did examine the vessel to see if she were capable of doing the job then in contemplation. She completely performed all that was required of her equipment and in the absence of knowledge on the part of the steel corporation that something detrimental had thereafter happened to her equipment, it was justified in believing that the weight-carrying capacity of the boom was unimpaired. Instead of informing the company of the mishap which had come to the O'Boyle No. 1, in February, 1943, petitioner put the crane at the disposal of the charterer, with the specific assurance that the boat was in first rate operating condition.

To my mind, petitioner, after having repaired the boom, and having made no test of the strength it then had, should be held guilty of a grievous wrong in not warning the steel company of what had taken place since it had last employed the vessel for a heavy task. As matters turned out, it is evident that the O'Boyle No. 1 had, in fact, become a hazard and menace, not alone to property, but to human life and limb. For this reason, petitioner's request for a limitation of liability will be denied.

■ Petitioner's further argument that Fichter Steel Corporation should here be defaulted by reason of its delay in filing an answer to the petition for limitation will be overruled. On May 19, 1944, this court made an order permitting the steel company to file an answer to the petition, and such answer was then brought to the attention of Anthony O'Boyle, Inc. True enough, the answer was not formally filed with the clerk until the day on which trial of the issues began. This was in no way prejudicial to petitioner, inasmuch as it had long been apprised of the contents of the answer and knew precisely what it would have to meet by way of defense upon the trial. As a result, there is no merit in petitioner's contention on this score.

■ Likewise, the contention of Shamrock Towing Company that this court is without jurisdiction of the petition for limitation for the reason that the ad interim stipulation for value was not seasonably filed will be overruled. Although that document's filing date was more than six months after Shamrock Towing Company's claim was received by petitioner, it is clear that the stipulation had been deposited with the court "within such period." It is no fault of petitioner that the stipulation was not immediately approved by a judge, and formally filed with the clerk. Petitioner, therefore, should not lose any rights by such delay as occurred.

In view of my finding of negligence on the part of petitioner, it is unnecessary to comment on its assertion that since there was no privity of contract between it and Shamrock Towing Company, the latter concern is without standing in this proceeding.