**Brian K. KOERNSCHILD and Roberta L. Koernschild, Plaintiffs,**

v.

**W.H. STREIT, INC., Defendant.**

Civ. A. No. 92–4719 (JEI).

United States District Court,
D. New Jersey.

Oct. 20, 1993.

Neil A. Morris Associates, P.C. by Neil A. Morris, Laurence L. Smith, Westmont, NJ, for plaintiffs.

Clark, Ladner, Fortenbaugh & Young by Stephen P. Pazan, Cherry Hill, NJ, for defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

IRENAS, District Judge.

Plaintiff fell while mounting a crane on a pontoon platform system chartered by the defendant, thereby sustaining serious and permanent injuries. He and his wife initially brought suit under the Jones Act and related maritime provisions, but later stipulated that he was in fact a longshoreman as the term is used in the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. 901 *et seq.* Plaintiff's amended complaint stated two causes of action, one for negligence under the LHWCA, the other for loss of consortium. Defendant now comes before this Court with a motion to dismiss under Fed.R.Civ.P. 12(b)(6), and in the alternative moves for summary judgment under Fed. R.Civ.P. 56.

Because genuine issues of material fact exist as to whether the platform on which the plaintiff was injured qualifies as a "vessel" under § 905(b) and whether the plaintiff was aware that oil had leaked onto one of the wheel hubs, defendant's motion for summary judgment is denied as to all claims.

### Factual Background

Defendant W.H. Streit, Inc. is a construction company that specializes in marine construction. It contracted to perform repairs on several electrical transmission line towers crossing the Patuxent River, near Chalk Point, Maryland. Plaintiff Brian Koernschild was assigned to the Patuxent site in the winter of 1991.

The contract involved the repair of the bottom portions of four towers located in the

middle and/or channel portion of the Patuxent River. To get men and machinery to the towers, defendant leased several "flexifloat barges,"[1] modular pontoon systems comprising interlocking pieces that were assembled on the shore, loaded, and towed to the construction site. Upon arrival, the flexifloat was anchored by a series of long tubes, or "spuds," that were driven into the river bottom. The flexifloat was anchored for several days at a time, but could be moved to other positions along the towers or to the shore.[2] At the end of the job, the flexifloats were disassembled and returned to the owner.

Among the items loaded onto the flexifloat on which the plaintiff worked was a Bantam hydraulic crane, which was secured to the barge with metal cables. Plaintiff operated this crane on several occasions, mostly to move smaller boats from the barge to the water. At various times, plaintiff noticed that the crane appeared to be leaking oil or lubricant; he made entries to this effect in the crane's operating log. In addition, plaintiff brought the leaks to the attention of his supervisor, Michael Reed, who allegedly told him to continue using the crane.

On July 10, 1991, plaintiff attempted to board the crane by stepping into the hub of one of the tires. He slipped and fell, sustaining serious injuries to his back. Plaintiff filed a complaint against W.H. Streit in November, 1992. He alleged various causes of action under the Jones Act, 46 U.S.C. § 688 *et seq.*, and general maritime law; his wife Roberta also filed a claim for loss of consortium.

In June of 1993, the parties entered into a Stipulation wherein they agreed that Brian Koernschild was not a "seaman" or "member of the crew" as defined by the Jones Act.[3] Plaintiff then withdraw all claims filed under the Jones Act, proceeding instead under the Longshore and Harbor Workers' Compensation Act. Plaintiffs filed an amended complaint on June 17, 1993. It alleged two causes of action: one for "negligence of the vessel" under § 905(b) of the LHWCA, and Roberta Koernschild's claim for loss of consortium.

On August 30, 1993, defendant filed a motion to dismiss, and, in the alternative, a motion for summary judgment. It contended that the flexifloat barge was not a "vessel" for purposes of the Act; even if it were, defendant claimed that plaintiff's knowledge of the risk of leaking lubricant precluded recovery under *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). In addition, defendant claimed that Roberta Koernschild's action for loss of consortium was barred by *Miles v. Apex Marine Corporation*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

## Legal Discussion

### I. *The Appropriate Standard of Review*

### A. The Standard under Fed.R.Civ.P. 56(c)

Defendant has framed this motion as one to dismiss under Rule 12(b)(6), or, in the alternative, as one for summary judgment under Rule 56. When making a determination under Rule 12(b)(6), the court cannot consider matters outside of the pleadings. When, as here, both parties present extraneous material as part of their motion or opposition, this court has the discretion to accept the extraneous material and convert the motion into one for summary judgment. Fed.R.Civ.P. 12(b); *Rose v. Bartle*, 871 F.2d 331, 339–40 (3d Cir.1989); *Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264 (D.N.J.1990); *Elysian Federal Savings v. First Interregional Equity*, 713 F.Supp. 737, 740 (D.N.J.

---

1. We use the term "barge" in this instance only for lack of a better descriptive term, and not to indicate that the moving platform used to transport materials and workers to the towers was a "vessel" for purposes of the LHWCA. The status of the flexifloat *qua* vessel is discussed in section II.C.

2. The parties dispute the mobility of the flexifloat barges. Plaintiffs claim that the barges could, and were, moved often around the site. Defendants contend on the other hand that the barges may have been moved as little as twice, because attempts at navigation were cumbersome and ultimately rejected as impractical.

3. Apparently, plaintiff was receiving compensation under the Longshore and Harbor Workers' Compensation Act until just after filing his suit. At that time, defendant W.H. Streit suspended payments under the Act, claiming that suit under the Jones Act precluded recovery under the LHWCA.

1989); 5 Charles Wright & Arthur Miller, Federal Practice and Procedure § 1366 at 678 (West 1969 & Supp.1989).

Under Fed.R.Civ.P. Rule 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

At the summary judgment stage, it is not the role of the judge to weigh the evidence or to evaluate its credibility, but simply to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party such that a reasonable jury could return a verdict for that party. *Id.* Although the moving party bears the initial burden of informing the district court of the basis for its motion, there is no requirement in the Rule that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.

The Supreme Court has stated that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citation omitted) (internal quotations omitted). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Finally, summary judgment should be granted unless the dispute over a material fact is genuine, which the Court has defined as such that "a reasonable jury could return a verdict for the non-moving party." *Id.*

### B. The Standard Under the LHWCA

■ In general, laws providing for the relief of injured employees, like the Longshore and Harbor Workers' Compensation Act, should be construed liberally. *Baltimore & Philadelphia Steamboat Co. v. Norton*, 284 U.S. 408, 414, 52 S.Ct. 187, 189, 76 L.Ed. 366 (1932). As a remedial and humanitarian measure, the LHWCA "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 92, 98 L.Ed. 5 (1953); *see also Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); *Reed v. The Steamship Yaka*, 373 U.S. 410, 415, 83 S.Ct. 1349, 1353, 10 L.Ed.2d 448 (1963); *Pillsbury v. United Engineering Co.*, 342 U.S. 197, 72 S.Ct. 223, 96 L.Ed. 225 (1952). The rights of covered employees should not be defeated by mere technicalities, and doubts should be resolved in favor of the injured shipworker. *Candado Stevedoring Corp. v. Lowe*, 85 F.2d 119 (2d Cir.1936); *Southern S.S. Co. v. Norton*, 101 F.2d 825 (3d Cir.1939).

In the case at bar, the disputes between the parties center on two issues: (1) whether the flexifloat barge/platform on which plaintiff worked as a crane operator constitutes a "vessel" for purposes of the Longshore and Harbor Workers' Compensation Act; and (2) whether the actions of W.H. Streit and its employees may fairly be said to constitute actionable negligence under § 905(b). We examine each in turn.

### II. *Operation of the Longshore and Harbor Workers' Compensation Act on Plaintiff's Claims*

#### A. Status of the Plaintiff

Initially, plaintiffs brought suit under the Jones Act, which required the plaintiff to be a "seaman" or a "member of a crew." In June 1993, however, apparently in response

to the termination of his benefits under the LHWCA, plaintiff stipulated as to the withdrawal of all claims under the Jones Act and as to his status as a "longshoreman," as that term is defined in the LHWCA.

Courts in the Third Circuit have allowed parties to enter into binding stipulations with respect to facts, issues, evidence, and governing law. *See, e.g., U.S. v. Kikamura,* 947 F.2d 72 (3d Cir.1991) (knowledge and intent); *Ivy Club v. Edwards,* 943 F.2d 270 (3d Cir. 1991), *reh'g denied, cert. denied sub nom. Del Tufo v. The Ivy Club,* —— U.S. ——, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992) (facts); *Williams Electronics Inc. v. Arctic Int'l,* 685 F.2d 870 (3d Cir.1982) (issues and evidence); *Jensen v. U.S.,* 743 F.Supp. 1091 (D.N.J. 1990); *Tannerfors v. American Fidelity Fire Ins.,* 397 F.Supp. 141 (applicable law). Because the stipulation entered into by the parties is a reasonable interpretation of the facts, and because neither party has contested Mr. Koernschild's status as a longshoreman,[4] we proceed to analyze his claims under the LHWCA.

### B. Operation of the LWHCA

The Longshore and Harbor Workers' Compensation Act is a worker's compensation scheme for those maritime workers who fail to qualify as "true seamen" under the Jones Act. The LHWCA is both comprehensive and exclusive: § 904 provides benefits for work-related injuries without regard to fault, while § 905 mandates exclusivity of remedies. However, § 905(b) does allow injured longshoremen to recover in tort against their employer for "negligence of a vessel":

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone else entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages

directly or indirectly and any agreements or warranties to the contrary shall be void.... If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.

33 U.S.C. § 905(b).

■■■ Where the employer acts in a dual capacity as the vessel owner or operator, the employer retains its immunity for acts taken in its capacity as an employer, but it may still be sued "*qua* vessel" (that is, as the owner or operator of the vessel) for acts of negligence. *Levene v. Pintail Enterprises, Inc.,* 943 F.2d 528 (5th Cir.1991); *Pfeifer v. Jones & Laughlin Steel Corp.,* 678 F.2d 453, 456 (3d Cir. 1982). Offenses "*qua* vessel" include the failure to maintain the ship's gear, equipment, and work space in a condition that allows a reasonably prudent employee to conduct operations free from unreasonable risks. *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). They do not include the negligence of a fellow longshoreman or construction worker; indeed, these fault-based inquiries are precisely what the LHWCA was designed to supplant.

The parties do not dispute their respective statuses as employer and employee under the Act. Rather, their disputes center on two areas: whether the flexifloat barges are indeed "vessels" to which § 905(b) applies, and, if so, whether the events that preceded Mr. Koernschild's fall are properly attributable to the defendant as operator of the vessel.

---

4. Defendant argues in its briefs that stipulating as to his status as a longshoreman is tantamount to resolving the issue of the barge's status as a "vessel" under the LHWCA. However, this is not a natural consequence of the stipulation, since one can be a longshoreman without working on a vessel. While the term "longshoreman" is not defined in the Longshore and Harbor Workers' Compensation Act, *Black's Law Dictionary* defines it as "a maritime laborer, such as a stevedore or loader, who works about wharves of a port." *Cf.* 33 U.S.C. § 902(3) (containing broad definition of the term "employee").

### C. What Constitutes a "Vessel" for the Purposes of § 905(b)?

The contraption on which the plaintiff sustained his injuries cannot easily be reconciled with the conventional definition of a vessel. The flexifloat barge was a collection of modular pieces that interlocked for ease of transport. It was not registered with the Coast Guard, nor was it inspected by any federal or state agency. While technically capable of navigation, it lacked the attributes of a navigable vessel: a means of propulsion, lights, a rudder, a bow or stern, or a cabin. In addition, attempts at navigation were found to be unduly time-consuming and later abandoned.

The parties have offered different definitions of the term "vessel." Plaintiffs champion what might loosely be termed the "Archimedes principle" definition of vessel. That is, if the contrivance has the capacity to float, and is in fact used to transport workers and material over water from the shore to a work site, or from work site to work site, it should be considered a vessel for purposes of § 905(b).

Defendant argues for a functional definition, which would examine the use of the contrivance at the time of the injury. It argues that, if the overriding purpose of the flexifloat barge is to serve as a work platform, and if it does not otherwise manifest the traditional characteristics of a vessel (i.e., means of propulsion, bow, stern, rudder, etc.), it is not a vessel under § 905(b), notwithstanding its ability to float and transport materials. In the defendant's view the transportation function of the barge is merely incidental to its role as a work platform.

█ The starting point for the interpretation of a statute is the language of the statute itself. *Kaiser Aluminum & Chemical Corporation v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990); *Electronic Laboratory Supply Company, Inc. v. Cullen,* 977 F.2d 798, 802 (3d Cir. 1992). However, neither the Jones Act nor the Longshore and Harbor Workers' Compensation Act provides a definition of the term "vessel." Rather, courts have almost uniformly adopted the definition set forth in the General Provisions of the United States Code, 1 U.S.C. § 3, which defines a vessel as "every contrivance of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *E.g., McCarthy v. The Bark Peking,* 716 F.2d 130, 133 (2d Cir.1983).

The language of § 3 could hardly be more expansive, which is not surprising, since the wellspring of many aspects of admiralty law is the notion that the "special hazards and disadvantages to which they who go down to sea in ships are subjected" require special rules of law. *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 104, 66 S.Ct. 872, 882, 90 L.Ed. 1099 (1945) (Stone, C.J., dissenting); *see also McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 354, 111 S.Ct. 807, 817, 112 L.Ed.2d 866 (1991). If a contrivance floats and is used to move people or property over the water, it is exposed to these perils regardless of how non-conventional it may be.

Despite the sweeping text of § 3, some courts have found that contrivances that are technically capable of transportation, but that have been moored close to the shore to serve as work platforms, do not qualify as "vessels" for § 905(b) purposes. In *Keller v. Dravo,* 441 F.2d 1239 (5th Cir.1971), plaintiff was injured while repairing a vessel from a floating dry dock. Defendants moved for summary judgment, claiming that the dry dock, while technically capable of navigation, could not be considered a covered vessel under the LHWCA. The Fifth Circuit agreed, relying on previous holdings that "as a matter of law, a floating dry dock is not a vessel *when it is moored and in use as a dry dock.*" *Id.* at 1244 (emphasis in original); *citing Chahoc v. Hunt Shipyard,* 431 F.2d 576 (5th Cir.1970); *Atkins v. Greenville Shipping Corp.,* 411 F.2d 279 (5th Cir.1969). However, the *Keller* court was "unwilling to promulgate an absolute rule of law that a floating dry dock can never be a vessel." *Id.* at 1244.

*Keller* was decided under § 933(i) of the LHWCA, but later cases adopted a similar analysis for claims under § 905(b). In *Davis v. Cargill,* 808 F.2d 361 (5th Cir.1986), the site of plaintiff's accident was a dry cargo barge, which had been converted to a permanently moored work platform from which painting and sandblasting services were pro-

vided to barges. The platform floated on the water but was anchored close to the shore and was moved only to accommodate changes in tide. The Fifth Circuit found that this work platform was sufficiently similar to the dry dock in *Keller* to be excluded from vessel status. While originally capable of transportation, it had since been converted into a stationary object, and was "no longer designed or used for navigation." *Id.* at 362; *see also Kathriner v. UNISEA, Inc.*, 975 F.2d 657 (9th Cir.1992) (finding that floating fish processing plant that had been moved once in fifteen years, and that had been hooked up to city utilities, was not a vessel for § 905(b) purposes); *Ducrepont v. Baton Rouge Marine Enterprises, Inc.*, 877 F.2d 393, 395 (5th Cir.1989) (reversing denial of summary judgment under § 905(b) claim; finding that barge used for repairing and cleaning ships, which was moored at the time of the accident, was not a vessel for § 905(b) purposes).[5]

The common feature of this line of cases is that the putative vessels, irrespective of their capacity for navigation, have been moored close to the shoreline in order to serve as stationary work platforms. They are in effect extensions of land. The work to be completed, be it painting or repairing, is brought to the platform. The platform itself travels rarely, if at all, and then only to compensate for shifts in tide.

Not all floating structures which serve as work platforms are excluded from vessel status. Aircraft carriers, fishing boats, and cable-laying boats, for example, are work platforms in a very real sense. Yet no one would dispute their status as vessels. What distinguishes these vessels from the work platforms in *Davis* is that the former move people or equipment across water to the place where the work will be performed, while the latter are affixed close to the shoreline so that work may be brought to them. The transportation function of the moored barge in cases like *Davis* can be said to be truly incidental to its primary purpose of serving as work platform. However, where the floating contrivance must move over water to reach the work site, its transportation function may well be more than "incidental."[6]

Cases which have denied vessel status to particular structures have involved situations in which vessels were brought to the work platform for repair or service. In the instant case, however, the crane was placed on the flexifloat barge, which was then navigated, however clumsily, across the water to the transmission towers. Both sides concede that the barge was able to move from the shore to the transmission towers, and from point to point along the towers. Thus, the barge appears to be "used, or capable of being used, as a means of transportation on water" as defined in § 3.[7]

5. *Bernard v. Binnings Construction Co.*, 741 F.2d 824, 830 (5th Cir.1984) found three factors common to decisions holding that floating work platforms were not vessels: (1) the structures involved were constructed and used primarily as work platforms; (2) they were moored or otherwise secured at the time of the accident; (3) although they were capable of movement, any transportation function they performed was merely incidental to the primary purpose of serving as work platforms.

6. Although it would be impossible to harmonize every court decision which has decided, for a variety of reasons, whether a particular floating contrivance was or was not a "vessel," at least some of these decisions can be rationalized by distinguishing situations where the work comes to a floating platform which is fixed in one location from those in which the platform moves from place to place over the water to wherever the work needs to be done. *Compare Ellis v. U.S.*, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047 (1907) (floating dredges are vessels); *The*

*O'Boyle No. 1*, 64 F.Supp. 378 (S.D.N.Y.1946) (floating crane is a vessel); and *Charles Barnes Co. v. One Dredge Boat*, 169 F. 895 (E.D.Ky.1909) (floating structure used for pumping out coal barges, which was capable of being moved on the water by ropes attached to its capstans or by being towed is a vessel) *with Cope v. Vallette Dry Dock Co.*, 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887) (floating dry dock not a vessel); *Ruddiman v. Scow Platform*, 38 F. 158 (S.D.N.Y.1889) (floating structure moored to wharf from which refuse was loaded on to boats lying alongside not a vessel, even though capable of being towed from one wharf to another); *Woodruff v. One Covered Scow*, 30 F. 269 (E.D.N.Y.1887) (floating structure adjacent to wharf used to store oars and sails and as a means of access from the wharf to small boats was not a vessel).

7. *Cf. Ebanks v. Reserve Marine Enterprises*, 620 So.2d 355, 357–58 (Ct.App.La.1993):

   Thus, the phrase "capable of being used, as a means of transportation on water" has been

In cases factually similar to the one at bar, courts have denied summary judgment on the issue of whether the putative vessel qualified as a vessel under § 905(b). In *Orgeron v. Avondale Shipyards, Inc.*, 561 So.2d 38 (La.1990), the plaintiff was injured when he fell into an opening created by adjoining barges that were used to transport men and materials along the slip of a ship repair yard. The Supreme Court of Louisiana adopted the Fifth Circuit "modified capabilities" test for vessel status: there must be a maritime situs and a significant relationship to traditional maritime activity, and the structure must be sufficiently mobile to serve some transportation function. *Id.* at 43; *Ducrepont*, 877 F.2d at 396. It found that, while the transportation function of the barges was incidental to their primary use as work platforms, they did have "some design features not common to fixed, stationary platforms." 561 So.2d at 40. The barges were free floating, could be moved from place to place, and, because they could break loose from their moorings, were "subject to the perils of the sea." *Id.* These features distinguished the barges in *Orgeron* from the floating drydocks in *Davis* and *Ducrepont*, and rendered them vessels under § 905(b).

Similarly, the court in *Gianelloni v. Great Lakes Dredge & Dock Co.*, No. 92–2162, 1993 WL 370617 (E.D.La. Sept. 13, 1993) declined to find as a matter of law that crane barges were not vessels for purposes of § 905(b). Plaintiff had been injured twice while operating a crane on a "deck barge" or "crane barge" stationed along a portion of the Mississippi River. These barges were leased for the site, spudded to the river bottom, moved only 50 feet every two or three days, and kept on the site until the job was completed. Yet despite the paucity of movement, the court refused to find that the barges were not vessels under § 905(b), noting an absence of evidence concerning the transportation and function of the crane barges before and after the project. *See also Bryant v. Gates Constr. Co.*, 735 F.Supp. 602 (D.Del.1990) (same result on nearly identical facts); *Texaco, Inc. v. Addison*, 613 So.2d 1193 (Miss.

1993) (same result in case involving welding barge used to repair offshore oil collection and storage facility). *But see Lash v. Ballard Construction Co.*, 707 F.Supp. 461, 464 (W.D.Wash.1989) (finding that timber-and-styrofoam "derrick barge" did not constitute a vessel under § 905(b), explaining that the platform was used "solely as a structure upon which to float a clamshell shovel so that it could do the required dredging work").

The analysis in *DiGiovanni v. Traylor Brothers Inc.*, 830 F.Supp. 106 (D.R.I.1993) is particularly instructive. The injuries in that case occurred on a platform similar to the flexifloat, which was loaded with supplies and towed out to a construction barge on the Narragansett Bay. Defendants urged the court to adopt a *Davis* "floating platform" exception to the § 3 definition of vessel. The District of Rhode Island found that, even if such an exception were recognized, defendants had not demonstrated that the barges fit within the exception. In particular, the *DiGiovanni* court noted that the *Davis* line of cases involved barges that were more or less permanently moored, while the barge in that case was towed from place to place.

We adopt a similar analysis today. Even if the Third Circuit were to recognize an exception to § 3 for work platforms like that in *Davis*, it is unclear that the barge in this case would fall within the exception. Where the object is used in part as a work platform and in part as a means of transporting men and machinery across the water to a job site, we cannot say as a matter of law that it is not a vessel for the purposes of § 905(b) of the LHWCA.

D. What constitutes actionable negligence under *Scindia v. De Los Santos?*

As discussed above, section 905(b) precludes suit against the employer as employer, but permits suit against the employer for negligence as owner/operator of the vessel. The seminal case in this area is the Supreme Court decision in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), which involved a

---

interpreted in the context of the regular use to which a structure is put, rather than that of some use for which it might theoretically be capable. It has further been interpreted in the context of the structure's use at the time of the injury.

suit brought under the LHWCA. The plaintiff in that case worked for a stevedore employed by the defendant to unload the latter's vessel. While working in the ship's hold, the plaintiff was struck by cargo when a winch on the vessel failed to operate correctly.

The Supreme Court found that while there was no general duty under the LHWCA to supervise or inspect for dangerous conditions on board the vessel, the vessel or shipowner had a nondelegable duty (1) to maintain the ship's gear, equipment, tools, and physical work space in a condition that allows an experienced stevedore, acting with reasonable care, to conduct the cargo operations free from unreasonable risks; and (2) to warn the stevedore of hidden dangers that are or should be known to the vessel in the exercise of reasonable care and that are unknown to the stevedore and would not be obvious or anticipated by a stevedore performing reasonably competent work. *Scindia; Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 495 (3d Cir.1987); *Chaple v. Farrell Lines, Inc.*, No. 91–4841, 1992 WL 470240 (D.N.J. Oct. 9, 1992); *McSwiggan v. Oulu Shipping Ltd.*, Civ.A. No. 90–7001, 1992 WL 70416 (E.D.Pa. Mar. 31, 1992).

In addition, *Scindia* provided a second level of duty where the danger arises from the ship's gear being used in the cargo operations. Here, the vessel operator must warn of dangers if (1) the operator is aware of the danger, (2) he is aware that the stevedore is continuing to use the faulty equipment, and (3) the stevedore's judgment in using the equipment is "obviously improvident." 451 U.S. at 170, 172–76, 101 S.Ct. at 1624–27; *see also Brown v. Philippine President Lines, Inc.*, 704 F.Supp. 606, 609 (E.D.Pa.1989) ("Even this limited duty to intervene must be evaluated in terms of the vessel's reasonable reliance on the stevedore's exercise of professional judgment.").[8]

The most recent Third Circuit pronouncement in this area is found in *Kirsch v. Plovidba*, 971 F.2d 1026 (3d Cir.1992), a case with some factual similarity to the one at bar. A longshoreman was unloading cargo from the defendant's ship when he and his fellow crew members became aware of an oil spill in the ship's hold. The crew continued to traverse the area of the slick without taking any action to clean it up. Plaintiff's shoes retained the oil from the hold and he ultimately slipped, badly injuring himself. He brought suit under the LHWCA, and the lower court granted summary judgment in favor of the shipowner.

The Third Circuit began by noting that

under *Scindia*, a shipowner is subject to liability for the dangers of longshore workers who fail to avoid an obvious danger only if the shipowner should have expected that the stevedore and its longshore workers could not or would not avoid the danger and conduct cargo operations reasonably safely....

A shipowner *will not ordinarily be liable to a longshore worker injured by an obvious hazard* because the shipowner's duty is only to provide a workplace where skilled longshore workers can operate safely.

971 F.2d at 1026, 1029 (emphasis added). The court found that the stevedore and his longshore workers were aware of the slick, and that the crew could have avoided the danger (either by cleaning the mess or by directing an alternate route). Since the plaintiff in that case failed to present evidence that the defendant should not have assumed that the longshoreman would avoid the obvious danger, the grant of summary judgment was affirmed.

*Kirsch* stands for the proposition that, where an employee is aware of an obvious hazard and continues operations without doing anything to alleviate the risk caused by the hazard, and is injured by the hazard, the operator of the vessel is not liable under *Scindia*. In the case at bar, a factual dispute exists concerning whether plaintiff was aware that oil or lubricant was leaking in the particular hub into which he placed his foot.

---

8. Defendant argues that the crane is not "ship's gear," since it was brought on board the flexi-float for the limited purpose of aiding the repairs. However, since Streit itself brought the crane on board, to aid in the completion of its

Summary judgment is therefore inappropriate in this motion.[9]

### III. *Recovery for Consortium*

 Defendant also argues that Roberta Koernschild may not properly maintain a claim for loss of consortium after the Supreme Court's decision in *Miles v. Apex Marine Corporation*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1991). There, the mother of a seaman who had been stabbed to death by a crew member sued for lost income and loss of services. Citing limiting language in the Jones Act and the Death on the High Seas Act,[10] the Supreme Court held that there was no recovery for loss of society in a Jones Act wrongful death action.

However, *Miles* involved claims under the Jones Act and general maritime law. The appropriate starting point for the consideration of whether the *LHWCA* allows recovery for loss of consortium is the earlier Supreme Court decision in *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). *Gaudet* concerned a wrongful death action brought by the widow of a longshoreman who had allegedly died from injuries obtained while in navigable waters. The Court found that she could properly maintain a suit for "the loss of support, services, and society." *Id.* at 584, 94 S.Ct. at 814. The holding was extended six years later, in *American Export Lines v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980), to cover loss of consortium for non-fatal injuries under general maritime law.

*Miles* distinguished *Gaudet* by observing that: "The holding in Gaudet applies only in territorial waters, and it applies only to longshoremen." *Miles*, 498 U.S. at 31, 111 S.Ct. at 325. However, because *Miles* did not address the holding in *Alvez*, it left unanswered whether the *Gaudet* analysis or the *Miles* analysis is appropriate for cases involving *non*-fatal injury to a longshoreman. *See Murray v. Anthony J. Bertucci Construction Co.*, 958 F.2d 127, 130–31 (5th Cir.1992) ("*Miles* must have, at least implicitly, placed the same restriction [i.e., only to longshoremen and only in territorial waters] on *Alvez* because that opinion merely extended *Gaudet* to personal injury actions."). A panel of the Superior Court of New Jersey, Appellate Division, found that "Section 905(b) preserves a common-law cause of action; it does not create one. Moreover, absent a statute-created limitation, court will not bar the right of a dependent to bring a derivative claim." *Fanoli v. Sea–Land Services*, 251 N.J.Super. 443, 598 A.2d 911 (App.Div.1991) (citing *Gaudet*).

Because we do not read *Miles* as barring a longshoreman injured in territorial waters from asserting a loss of consortium claim, we will deny defendant's motion as to Roberta Koernschild's individual claim.

For the reasons set forth above,

**IT IS** on this <u>20th</u> day of October, 1993,

**ORDERED THAT** defendant's motion to dismiss and, in the alternative, for summary judgment be, and the same hereby is, **DENIED** as to all claims.

---

contract, it should be deemed part of the ship's gear.

9. We find it difficult to reconcile plaintiff's deposition testimony that "the whole crane leaked" (Koernschild Transcript at T137/23) and "just about any hydraulic fitting had a small leak on it" (T174/17–18) with his later statement that there was no leakage into the hub where he placed his foot before the accident (T174/22), and even more with his interrogatory response that "unbeknownst to Plaintiff, the crane was leaking lubricant on its lower level" (answer to Interrogatory 50A). Also troubling is the testimony of Carl Sturgeon that Koernschild landed in front of the front right wheel (Sturgeon Transcript at T26/4–5), when Koernschild claims to have mounted the rear right wheel. However, in a summary judgment motion, we construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

10. The Court found that, by their terms, DOHSA and the Jones Act limited recovery to "pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C.App. § 762.